MACK V. STATE

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-05-359-CR

HOWARD MACK APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 158TH DISTRICT COURT OF DENTON COUNTY

------------

OPINION

------------

I.  Introduction

Appellant Howard Mack appeals from his conviction and life sentence for the murder of Sandra Oshunkentan.  In five issues, appellant contends that the trial court erred by refusing to give jury instructions that he requested, that the evidence is legally insufficient to support the jury’s finding that he used a knife, that the evidence is legally and factually insufficient to prove that he intentionally or knowingly caused Sandra’s death, and that there is a fatal variance between the indictment and proof as to the date of Sandra’s death.  We affirm.

II.  Background Facts

In the early morning hours of July 25, 2004, Denton police found Sandra dead from multiple stab wounds.  Her body had been hidden in the closet of her trailer, rolled in a comforter, and wrapped in trash bags.  Appellant, Sandra’s live-in boyfriend, was charged with and convicted of Sandra’s murder.  The jury assessed appellant’s punishment at life in prison.

III.  Sufficiency of the Evidence

We address appellant’s sufficiency of the evidence issues first.  
See Owens v. State
, 135 S.W.3d 302, 305 (Tex. App.—Houston [14th Dist.] 2004, no pet.).  In his third issue, appellant contends that the evidence is legally insufficient to prove that the object he used to cause Sandra’s injuries was a knife.  In his fourth issue, appellant contends that the evidence is both legally and factually insufficient to prove that he intentionally or knowingly caused Sandra’s death.  In his fifth issue, appellant contends that there is a fatal variance between the indictment and the proof at trial in that the indictment charges that appellant murdered Sandra “on or about the 24th day of July, 2004” but the evidence shows that she could have been killed the day after.

A.  Standards of Review

1.  Legal Sufficiency

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to 
the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Hampton v. State
, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).
  
The standard of review is the same for direct and circumstantial evidence cases.  
Burden v. State
, 55 S.W.3d 608, 613 (Tex. Crim. App. 2001); 
Kutzner v. State
, 994 S.W.2d 180, 184 (Tex. Crim. App. 1999).

The sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case.  
Malik v. State
, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); 
Ortiz v. State
, 993 S.W.2d 892, 895 (Tex. App.—Fort Worth 1999, no pet.).  Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State’s theories of liability, and adequately describes the particular offense for which the defendant was tried.  
Gollihar v. State
, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001); 
Malik, 
953 S.W.2d at 240.  The law as authorized by the indictment means the statutory elements of the charged offense as modified by the charging instrument.  
See Curry v. State
, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000).

2.  Factual Sufficiency

In reviewing the factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party.  
See Zuniga v. State
, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004).  The only question to be answered in a factual sufficiency review is whether, considering the evidence in a neutral light, the fact finder was rationally justified in finding guilt beyond a reasonable doubt.  
Id
. at 484.  There are two ways evidence may be factually insufficient:  (1) when the evidence supporting the verdict or judgment, considered by itself, is too weak to support the finding of guilt beyond a reasonable doubt; or (2) when there is evidence both supporting and contradicting the verdict or judgment and, weighing all of the evidence, the contrary evidence is so strong that guilt cannot be proven beyond a reasonable doubt.  
Id
. at 484-85.  “This standard acknowledges that evidence of guilt can ‘preponderate’ in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt.”  
Id
. at 485.  In other words, evidence supporting a guilty finding can outweigh the contrary proof but still be insufficient to prove the elements of an offense beyond a reasonable doubt.  
Id
.   In performing a factual sufficiency review, we are to give deference to the fact finder’s determinations, including determinations involving the credibility and demeanor of witnesses.  
Id.
 at 481; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for the fact finder’s.  
Zuniga, 
144 S.W.3d at 482.  

A proper factual sufficiency review requires an examination of all the evidence.  
Id
. at 484, 486-87.  An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant’s complaint on appeal.  
Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

B.  Use of Knife

The officers who searched Sandra’s trailer after finding her body found a butcher block in the kitchen with three unfilled slots.  They found two knives in the dishwasher:  a large butcher knife and a small steak knife.  Detective Bryan Lee testified that it appeared that the dishwasher had been run recently because there was condensation and wet spots on the glasses in the top rack.  The knives in the dishwasher were clean, but the butcher knife later tested weakly positive for blood.  The DNA analyst could not determine, however, what type of blood or whose blood it was. 

The officers never found a knife corresponding to the third unfilled slot in the butcher block.  They did find a lock-blade knife in Sandra’s SUV, which appellant had been driving after her death.
(footnote: 1)  That knife was clean but also tested weakly positive for blood.  However, as with the butcher knife, the DNA analyst could not tell what type of blood or whose blood it was. 

Dr. Gary Sisler, a deputy medical examiner for Tarrant, Parker, and Denton Counties, testified that he performed an autopsy on Sandra on July 26, 2004.  Dr. Sisler found seventeen wounds on Sandra, which he categorized as either stab wounds or cut wounds.  He described the stab wounds as being deeper than the surface dimension, i.e., deeper than long, and the cut wounds as being longer than deep. 

The first wound Dr. Sisler found was a stab wound into the abdominal cavity.  That wound was two inches deep, measured one inch across, and had smooth margins and a pointed end.  It went through the abdominal wall and muscle and the diaphragm, and it lacerated the liver.  Dr. Sisler testified that this wound could have been fatal by itself.  According to Dr. Sisler, this wound was consistent with a knife wound because it had a sharp end and a sharp margin.  Dr. Sisler testified that a knife has a pointed end and a sharp edge.  

Dr. Sisler testified that the second wound was an elliptical stab wound made by a triangular instrument with a blunt edge and sharp end.  It lacerated the left upper pulmonary lobe.  According to Dr. Sisler, most knives have a blunt edge opposite to the cutting edge, which was consistent with this type of wound.  The State asked Dr. Sisler if the butcher knife recovered from the dishwasher could have caused such a wound, and he said it could have. 

The third and fourth wounds were stab wounds that cut the soft tissue of the chest wall and lacerated the left upper pulmonary lobe.  Dr. Sisler testified that the fourth wound alone could have been fatal.  The fifth wound was a cut wound.  The sixth wound was a stab wound three inches deep, which partially transected the carotid artery.  According to Dr. Sisler, if the carotid artery is severed, a person has less than five minutes to live.  Dr. Sisler characterized the seventh wound as a fatal stab wound.  It “cut a major muscle of the neck and also another partial transection of the carotid artery.” 

Sandra also had a cut wound under her neck, a stab wound below her ear, a cut wound just above her right ear and another just below her right ear, one cut wound on top of her right shoulder and another on her right back shoulder, a three inch stab wound to her trapezius against the fifth cervical vertebral,
(footnote: 2) another stab wound into her cervical vertebral, a one-and-one-half-inch stab wound that lacerated muscle, and another one-and-one-half-inch stab wound that cut into her neck muscle.  Sandra also had superficial cut wounds and bruises on her hands, which Dr. Sisler characterized as defensive wounds.  According to Dr. Sisler, defensive wounds generally occur when a person tries to shield his or her face during an assault. 

Dr. Sisler further testified that to a reasonable degree of medical certainty, Sandra’s wounds were caused by a knife.  He also testified that the wounds could not have been caused by a screwdriver
(footnote: 3) because a screwdriver “makes a single slit and usually you’ll have scraped off ends.  We call them abrasions over the upper and lower margin.” 

We hold that the evidence is legally sufficient to prove that appellant used a knife to stab Sandra.  Although Dr. Sisler agreed on cross-examination that when the State asked him questions about the nature of the weapon being from a particular type and he was given an exhibit, “that would [have been] speculation,” his testimony was very clear about the nature of the wounds and the type of instrument that would have caused them.  Therefore, we overrule appellant’s third issue.

C. Mens Rea

According to appellant, the State failed to prove that appellant intentionally or knowingly caused Sandra’s death.

Penal code section 6.03 defines the intentional and knowing mental states as follows:

(a) A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

(b) A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist.  A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

Tex. Penal Code Ann.
 § 6.03(a),(b) (Vernon 2003).  Intent can be inferred from the acts, words, and conduct of the accused.  
Patrick v. State
, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995), 
cert. denied
, 517 U.S. 1106 (1996).  It can also be inferred from the means used and the wounds inflicted.  
Womble v. State
, 618 S.W.2d 59, 64 (Tex. Crim. App. [Panel Op.] 1981); 
Yanez v. State
, 199 S.W.3d 293, 311 (Tex. App.—Corpus Christi 2006, no pet.).  Intent may also be inferred from acts indicating a consciousness of guilt.  
See Claxton v. State
, 124 S.W.3d 761, 766 (Tex. App.—Houston [1st Dist.] 2003, pet. ref’d); 
cf. Montgomery v. State,
 810 S.W.3d 372, 396 (Tex. Crim. App. 1990) (op. on reh’g) (noting that the appellant’s intent to arouse and gratify his own desire could be inferred by his consciousness of wrongdoing, as evidenced by his telling children not to reveal to anyone what had happened).

The evidence showed that appellant and Sandra had argued heatedly in the past and before her death, that appellant had behaved angrily and violently with Sandra at least twice before her death, that he was possessive of her,  and that she was afraid of him.  Appellant inflicted eleven stab wounds and six cut wounds on the front and back of Sandra’s body.  At least four of the stab wounds were potentially fatal by themselves.  In addition, it can be reasonably inferred that appellant showed a consciousness of guilt by telling his friend Tracy Love that he had stabbed Sandra but not to tell anyone what he had done, by washing the knives in the dishwasher, by attempting to conceal evidence of the stabbing,
(footnote: 4)and by lying to the police about his and Sandra’s whereabouts on the night of the murder.  We hold that the evidence is both legally and factually sufficient to support the jury’s finding that appellant acted either intentionally or knowingly.

Having determined that the evidence is both legally and factually sufficient to prove that appellant caused Sandra’s death and that he did so intentionally, we overrule appellant’s fourth issue.

D.  Date of Death

The indictment charged that appellant stabbed Sandra “on or about the 24th day of July, 2004.”  At the close of the State’s evidence, appellant moved for a directed verdict on the following grounds:  according to the medical examiner investigator’s testimony, Sandra’s death could have occurred anywhere from twelve to twenty-four hours before the investigator examined her at the scene; therefore, “[t]hat period of time could have exceeded and gone past midnight on July the 24th and been into July 25th, and the date was not narrowed to being a period anterior to the date alleged in the indictment or the date on the indictment.” 

Troy Taylor, an investigator for the medical examiner’s office, testified that one of his jobs is to estimate time of death.  He examined Sandra’s body at her trailer at approximately 9:45 a.m. on Sunday, July 25, 2004, the day police found her body.  Taylor estimated the time of death as approximately eighteen to twenty-four hours before his examination.  However, he later testified that Sandra could have died between twelve and twenty-four hours before he examined her.  A reasonable inference from this testimony is that Sandra’s death occurred anywhere from 9:45 a.m. on Saturday, July 24 (because the police discovered Sandra’s body around 2 a.m. on July 25) to 9:45 p.m. on the 24th.
(footnote: 5)  In addition, Taylor also testified that Sandra could have died as early as 9:16 a.m. on Saturday.
(footnote: 6) 

Because Taylor’s testimony about time of death is consistent with the date of death alleged in the indictment, we hold that there is no fatal variance between the indictment and proof at trial as to the date of Sandra’s death.  
See Gollihar
, 46 S.W.3d at 246.  We overrule appellant’s fifth issue.

IV.  Manslaughter and Sudden Passion Instructions

In his first issue, appellant contends that “the trial court erred by refusing the jury instruction for . . . the lesser included offense of second degree murder.”  However, he also complains in the same issue about the trial court’s failure to include a manslaughter instruction in the charge.  Because appellant properly asked for and was denied both instructions, and because it appears that he is challenging the denial of both in his first issue, we will review both complaints.

A.  Manslaughter

1.  Applicable Law

We use a two-pronged test to determine whether a defendant is entitled to an instruction on a lesser-included offense.  
Rousseau v. State
, 855 S.W.2d 666, 672-73 (Tex. Crim. App.), 
cert. denied
, 510 U.S. 919 (1993); 
Royster v. State
, 622 S.W.2d 442, 446 (Tex. Crim. App. [Panel Op.] 1981) (op. on reh’g).  First, the lesser-included offense must be included within the proof necessary to establish the offense charged.  
Salinas v. State
, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005);  
Rousseau
, 855 S.W.2d at 672-73; 
Royster
, 622 S.W.2d at 446.  Second, some evidence must exist in the record that would permit a jury to rationally find that if appellant is guilty, he is guilty only of the lesser offense.  
Salinas
, 163 S.W.3d at 741; 
Rousseau
, 855 S.W.2d at 672-73; 
Royster
, 622 S.W.2d at 446.

Appellant was charged with murder under section 19.02(b)(1) of the penal code, which provides that “[a] person commits an offense if he . . . intentionally or knowingly causes the death of an individual.”  
Tex. Penal Code Ann.
 § 19.02(b)(1) (Vernon 2003).  Appellant asked that the jury be given an instruction on manslaughter under section 19.04 of the penal code, which provides that “[a] person commits an offense if he recklessly causes the death of an individual.”  
Id
. § 19.04(a).  A person acts recklessly when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur.  
Id
. § 6.03.   

Manslaughter is a lesser-included offense of murder.  
Cardenas v. State
, 30 S.W.3d 384, 392-93 (Tex. Crim. App. 2000); 
Montgomery v. State
, 198 S.W.3d 67, 91 (Tex. App.—Fort Worth 2006, pet. filed).  Thus, the first prong of the 
Rousseau
 test has been met, and we must decide whether the record contains some evidence that would permit a jury to rationally find that appellant is guilty only of the lesser-included offense of manslaughter.  
Rousseau
, 855 S.W.2d at 672-73; 
Montgomery
, 198 S.W.3d at 91.

2.  Applicable Facts

Appellant points to evidence that he and Sandra were arguing before she died, that they had argued violently in the past, and that Sandra picked up the knife first as entitling him to a manslaughter instruction.  Courtney Durham, Sandra’s friend, testified that Sandra and appellant’s relationship changed after they started dating, and Sandra became stressed out, frustrated, and unhappy.  Appellant started hanging around Sandra more and either did not want her to go out with her girlfriends or went out with them.  Sandra became tearful at work and wanted to end her relationship with appellant.  Once when she tried to move appellant out of the trailer with Courtney’s help, appellant came through the door angrily, took Sandra into the bedroom with him, and locked the door.  She was screaming and afraid.  Another time, in May 2004, Sandra locked appellant out of the trailer, and he kicked in the door until it burst open.  Durham called 911, and when the police arrived, appellant agreed to leave.  

Appellant’s friend, Tracy Love, testified that on Saturday, July 24, 2004, the day of Sandra’s death, appellant showed up in Norman, Oklahoma, where Tracy was visiting his girlfriend, around 10:45 or 10:50 p.m.  Appellant called Tracy’s cell phone and asked to meet.  They met at a gas station.  Tracy asked appellant where Sandra was.  Appellant first said that he did not know where Sandra was, but he then told Tracy that “he [had] stabbed her and put her in the closet.”  When Tracy asked appellant why he had done that, appellant said, “[I] don’t know.”  Appellant was crying and emotional and said that he wanted to kill himself.  He appeared to be in a state of shock.  Appellant told Tracy that Sandra’s last words were that she loved appellant.  Tracy testified on cross-examination that appellant had called him earlier that day and said Sandra was “tripping” about appellant going to Whitesboro to see his daughter. 

Detective Shane Kizer with the Denton Police Department interviewed appellant after the police found Sandra’s body.  He took appellant to the police station where appellant gave a statement detailing his activities on the day Sandra was killed (which, if believed, would have precluded any involvement in her death).  After appellant gave his statement, Detective Kizer told appellant that what he believed really happened

was that for some reason that he and Sandra had gotten into an argument, . . . .  [D]uring the course of the argument . . . that he got enraged, lost control, did something that caused Sandra’s death, then he went into kind of shock, decided to try and cover it up.  A little bit later, 
he came to his senses, realized what he was doing was wrong
 . . . .  [Emphasis added.] 

 Detective Kizer testified that while he was saying this to appellant, appellant “was very intent on what I was saying, and the whole time, he was - - as he was listening, he was nodding his head as if to be saying yes.”  Detective Kizer then asked appellant if that was what happened.  At that point, appellant invoked his right to counsel. 

Staci Irvin, one of appellant’s former girlfriends, testified that after Sandra’s death, she went to see appellant in jail several times because she wanted to know “why it happened.”  Appellant told Staci that Sandra had pulled a knife and dropped it, then he picked it up.  He also said that Sandra had “died fast.”  When Staci asked appellant why he did not just walk away because he was bigger, he said, “[Y]ou don’t know what you would do in that situation.”  Staci knew that appellant and Sandra argued a lot and that Sandra would “put him out” of the house, then let him move back in. 

Sandra’s brother, Cody Housden, testified that appellant and Sandra argued a lot and that their arguments were very heated.  He also testified that a couple of weeks after Sandra died, appellant called Cody and Sandra’s mother’s house from jail.  The call was recorded, and the State introduced the recording into evidence at trial.  Appellant relies heavily on the statements he made in this recorded call as entitling him to instructions on manslaughter and sudden passion.
(footnote: 7)
 Sandra’s mother answered the phone.  Appellant told her that on Saturday, July 24, 2004, the day of the murder, he and Sandra watched a movie, went to the store, and then went back to Sandra’s trailer.  They lay down, and he peeled Sandra’s back where it had been sunburned.  They started talking about his little girl and started arguing.  According to appellant, he and Sandra were both being stubborn.  She started yelling and turned over a chair; appellant had never seen Sandra so mad.  Appellant said Sandra did not want him to go, but it is unclear whether he was referring to him moving out of the trailer or to him going to Whitesboro to see his daughter.

Appellant said that he and Sandra wound up in the kitchen.  She did not want him to leave, but she was scared of him and scared of men.  She was screaming and yelling.  Appellant told Sandra’s mother that he did not go get the knife.  Sandra went into the kitchen and put the knife in the sink.
(footnote: 8)  He came behind Sandra, and they were talking.  He did not ask her why she had the knife, and he did not run.

Cody talked to appellant next.  Appellant told Cody that he knew what he had done and why he was in jail.  Cody asked appellant several times what had happened.   Appellant told Cody that he and Sandra had watched a movie and then gone grocery shopping.  Afterwards, they went back to Sandra’s bedroom and lay down where appellant peeled skin off her back.  According to appellant, Sandra did not want appellant to go,
(footnote: 9) and he asked her why.  They started talking, and she went into the living room.  According to appellant, Sandra was so angry she flipped over the leather chair in the living room.  She was also yelling.  Appellant said Sandra was scared of him and of all men, and he did not know why.

According to appellant, he and Sandra were talking about the kids and his little girl whom he was supposed to go get that weekend.  Sandra did not want him to go get his little girl.  Appellant told Cody that he was standing “in the doorway,” and Sandra was “pissed.”  He asked her why she was “tripping” and afraid of him.

Appellant told Cody that he did not get the knife; he and Sandra had been eating beans, and the knife was already out.  He did not know when Sandra took the knife out.  Appellant told Cody that Sandra put the knife in the sink.  He also told Cody that he wanted to ask Sandra why the knife was out, but he thought she had it because she was scared of him.  Appellant also told Cody that Sandra was yelling and grabbed the knife, but he grabbed her arm, and she dropped it on the table.  Appellant said that Sandra did not come at him with the knife, and he was trying to hold her.  He got on his knees to hold her and talk to her.  When Cody asked appellant why he “did it,” i.e., killed Sandra, appellant answered, “We was still there in the kitchen,” and “I don’t know.  We both wasn’t thinkin’.”

On the recording, appellant’s voice is soft and shaky, and he sounds agitated.  Although Cody’s and Sandra’s mother’s parts of the conversation can be heard clearly, it is difficult at times to tell what appellant is saying.

3.  Analysis

For a defendant to be entitled to a jury charge on manslaughter, the record must contain some evidence that the defendant did not intend to kill 
and
 that the defendant acted recklessly, i.e., that he consciously disregarded a substantial and unjustifiable risk of death of which he was aware. 
Tex. Penal Code Ann.
 § 6.03; 
Kennedy v. State
, 193 S.W.3d 645, 651 (Tex. App.—Fort Worth 2006, pet. filed) (en banc) (op. on reh’g);
 see Munoz v. State
, 932 S.W.2d 242, 245 (Tex. App.—Texarkana 1996, no pet.).

Here, there is no evidence that when appellant stabbed Sandra, he was aware of the risk of death but consciously disregarded it.  To the contrary, the evidence pointed to by appellant shows that he either did not know why he stabbed Sandra or that he lost control of his senses and did not realize until later that he had done something wrong.  Neither of these explanations shows that appellant consciously disregarded a known risk of death of which he was aware.  Thus, we hold that there is no evidence 
that would have permitted a jury to rationally find that appellant was guilty only of manslaughter.

B.  Second-Degree Murder

1.  Applicable Law

During the punishment phase of a murder trial, a defendant may argue that he caused the death while under the immediate influence of sudden passion arising from an adequate cause.  
McKinney v. State
, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005).  Sudden passion is “passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation.”  
Tex. Penal Code
 
Ann
. § 19.02(a)(2).  An adequate cause is a “cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.”  
Id
. § 19.02(a)(1).

Sudden passion is a mitigating circumstance that, if proven by a preponderance of the evidence, reduces the offense of murder from a first-degree felony to a second-degree felony.  
Id
. § 19.02(c), (d); 
McKinney
, 179 S.W.3d at 569.  Thus, appellant’s contention that second-degree murder is a lesser-included offense of first-degree murder is incorrect.  Instead, the offense—murder—is the same for guilt-innocence purposes; the difference is that a sudden passion finding reduces the range of punishment for the offense of murder.  
See 
Tex. Pen. Code Ann
. § 19.02(c), (d); 
McKinney
, 179 S.W.3d at 569; 
Williams v. State
, 35 S.W.3d 783, 787 (Tex. App.—Beaumont 2001, pet. ref’d).  Nevertheless, because—as with a lesser-included offense instruction—the trial court should instruct the jury on sudden passion if it is raised by the evidence, even if that evidence is weak, impeached, contradicted, or unbelievable, 
see McKinney
, 179 S.W.3d at 569; 
Trevino v. State
, 100 S.W.3d 232, 238 (Tex. Crim. App. 2003),
(footnote: 10) 
we will review his claim that he should have received a sudden passion instruction.

To be entitled to a jury instruction on sudden passion, a defendant must prove that there was an adequate provocation; that a passion or an emotion such as fear, terror, anger, rage, or resentment existed; that the homicide occurred while the passion still existed and before there was reasonable opportunity for the passion to cool; and that there was a causal connection between the provocation, the passion, and the homicide.  
McKinney
, 179 S.W.3d at 569.  In determining whether a trial court should have given an instruction on sudden passion, “an appellate court’s duty is to look at the evidence supporting that charge, not . . . the evidence refuting it.”  
Trevino
, 100 S.W.3d at 239.

There is no requirement that evidence admitted at guilt-innocence be re-offered to be considered at punishment.  
Id. 
at 238.  Indeed, evidence on a punishment issue “will often come out in the course of the State’s own evidence of the circumstances of the offense itself, at the guilt phase of trial.”  
Id
. (quoting 
Williams v. State
, 851 S.W.3d 282, 286 n.2 (Tex. Crim. App. 1993)).  Thus, in considering whether any evidence is raised on this issue, we review the record from both guilt-innocence and punishment.  
Williams
, 35 S.W.3d at 787.

2.  Applicable Facts

Neither the State nor appellant offered any additional evidence at punishment regarding what happened the day of the murder.  The State introduced evidence that after one of the times Sandra kicked appellant out of the trailer, appellant was involved in a three to three-and-a-half-hour standoff with police in which he sat in his truck and threatened to kill himself with a handgun.  Appellant was angry with Sandra for kicking him out of the trailer.   In addition, the State offered additional testimony from Staci about appellant’s violent behavior toward her when they were dating.  For example, Staci testified that after an argument, appellant hit her in the head with a closed fist ten to fifteen times.  On another occasion, he hit her in the face, and her nose started bleeding.  Staci testified to other incidents of violence as well.  On cross-examination, Staci admitted that she would fight back. 

3.  Analysis

According to appellant, he was entitled to an instruction on sudden passion because the evidence shows that “the parties were arguing, had prior relations which had become heated[,] and an alleged weapon had changed hands during the fight which apparently [led] to the dea[th] of the deceased.”  But there is no evidence that Sandra said or did anything other than argue with appellant—and at some point during the argument, pick up (or grab) and then put down (or drop) a knife—that would cause “a degree of anger, rage, resentment, or terror 
in a person of ordinary temper
, sufficient to render the mind incapable of cool reflection
.”  
Tex. Penal Code Ann.
 § 19.02(a) (emphasis added).

Appellant admitted to Cody, Sandra’s brother, that Sandra never came at him with the knife.  
Cf. McKinney
, 179 S.W.3d at 570 (stating, in context of holding that the appellant was not entitled to a sudden passion instruction, that “the only thing Jeremy did to Appellant was yell at him and push him.  These actions do not rise to the level of adequate cause.  There is no evidence that the verbal taunting and physical pushing by Jeremy” constituted adequate cause).  There is no evidence that Sandra had any other weapon in her hand, nor is there any evidence that she threatened appellant.  
Contra Trevino
, 100 S.W.3d at 239 (holding that the appellant was entitled to a sudden passion instruction when he offered evidence that he and his wife had a “verbal altercation”; that his wife then confronted him with a gun, pointed it at him, and fired it twice; that the gun misfired; that the appellant went into the bathroom to get his gun, and his wife shot at him while he was in the bathroom; that the two struggled over the guns; and that he eventually “managed” to shoot his wife).  To the contrary, the evidence from appellant himself indicates that Sandra was scared of him and that he was trying to comfort her or calm her down.  Thus, the evidence shows that although Sandra may have provoked appellant’s anger (or some other strong emotion) by yelling at him, arguing with him, being scared of him, and by picking up the knife without threatening him with it, that anger “is not objectively common in the ordinary, reasonable person [and] does not support” a sudden passion instruction.  
Rayme v. State
, 178 S.W.3d 21, 28 (Tex. App.—Houston [1st Dist.] 2005, pet. ref’d) (quoting 
Saldivar v. State
, 980 S.W.2d 475, 506 (Tex. App.—Houston [14th Dist.] 1998, pet. ref’d)).

Accordingly, after having reviewed the evidence that appellant claims raises the issue of sudden passion—without considering the weight or credibility of that evidence—we hold that the trial court did not err by refusing to give a sudden passion instruction.  We overrule appellant’s first issue.

V.  Self-Defense

In his second issue, appellant contends that the trial court erred by refusing to instruct the jury on self-defense.

A.  Applicable Law

Section 9.31(a) of the penal code provides that “a person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other’s use or attempted use of unlawful force.”
  
Tex. Penal Code Ann.
 § 9.31(a) (Vernon 2003).  Subsection b provides that the use of force is not justified in response to verbal provocation alone.  
Id
. § 9.31(b).

Section 9.32 states, “A person is justified in using deadly force . . . (1)  if he would be justified in using force . . . under Section 9.31[,] (2) if a reasonable person in the actor’s situation would not have retreated[,] (3) when and to the degree he reasonably believes the deadly force is immediately necessary . . . to protect himself against the other’s use or attempted use of unlawful deadly force.”  
Id
. § 9.32(a).  
“‘Deadly force’ means force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury.” 
 Id
.
 
§ 9.01(3).

A defendant is entitled to an instruction on self-defense if evidence raises the issue, regardless of whether that evidence is weak or strong, unimpeached or contradicted, and regardless of what the trial court may or may not think about the credibility of the defense.  
Hamel v. State
, 916 S.W.2d 491, 493 (Tex. Crim. App. 1996); 
Hill v. State
, 99 S.W.3d 248, 250 (Tex. App.—Fort Worth 2003, pet. ref’d).  A reviewing court must view the evidence or testimony in a light most favorable to the appellant.  
Dyson v. State
, 672 S.W.2d 460, 463 (Tex. Crim. App. 1984)
.  But the instruction is not required if the testimony or other evidence viewed in the light most favorable to the appellant does not establish self-defense.  
See Granger v. State
, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999) (providing standard of review for defensive instructions).

Here, because appellant used deadly force, there must be some evidence to show that he reasonably believed that deadly force was immediately necessary to protect himself against Sandra’s use of unlawful deadly force and that a reasonable person in his position would not have retreated.  
See 
Tex. Penal Code Ann.
 §§ 9.31, 9.32;
 Dyson
, 672 S.W.2d at 463; 
Guilbeau v. State
, 193 S.W.3d 156, 159-60 (Tex. App.—Houston [1st Dist.] 2006, pet. ref’d); 
Flores v. State
, 49 S.W.3d 29, 34 (Tex. App.—San Antonio 2001, pet. ref’d).  In the absence of evidence of use or attempted use of deadly force by Sandra, the section 9.32 defense is not available.  
See Werner v. State
, 711 S.W.3d 639, 644 (Tex. Crim. App. 1986);
 Guilbeau
, 193 S.W.3d at 160
; 
Flores
, 49 S.W.3d at 34.  However, it is only necessary that there be some evidence that appellant reasonably believed that Sandra was using or attempting to use deadly force, not that she actually did so.  
See Hamel
, 916 S.W.3d at 493; 
Guilbeau
, 193 S.W.3d at 160
.

Appellant points to evidence that he and Sandra were arguing at the time of the stabbing, that Sandra picked up the knife first but then put it down and he picked it up, and that he tried to hold Sandra to calm her down as raising the issue of self-defense.  We hold that, even when viewed in the light most favorable to appellant, this evidence does not raise the issue of self-defense.

There is no evidence that Sandra was using or attempting to use deadly force or that appellant reasonably believed that she was.  According to appellant, Sandra had already put the knife down when he picked it up.  There is no evidence that she was holding any other type of weapon or that she was the aggressor.  Appellant told Cody that Sandra was scared of him and that she did not come at him with the knife.  In addition, Staci’s testimony shows that appellant was bigger than Sandra.  There was also testimony that although Sandra’s hands showed cut wounds that were consistent with trying to defend herself from being stabbed, appellant had only a small scratch on his right thumb and no other wounds that were consistent with defending himself.  Further, the officers who investigated Sandra’s death testified that they could find no signs of a struggle in the trailer. 

Accordingly, we hold that the trial court did not err by refusing to instruct the jury on self-defense.  We overrule appellant’s second issue.

VI.  Conclusion

Having overruled appellant’s five issues, we affirm the trial court’s judgment.

TERRIE LIVINGSTON

JUSTICE

PANEL A: LIVINGSTON, WALKER, and MCCOY

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED: October 12, 2006

FOOTNOTES
1:
It appears from the record that before Sandra’s death, she sometimes allowed appellant to drive her Expedition.  When the police first arrived at Sandra’s trailer on July 25, 2006 to check on her welfare, appellant drove up in the Expedition, in which the police recovered the lock-blade knife.  

2:
According to Dr. Sisler, the “vertebral body” is the spine. 

3:
Officers recovered a small screwdriver from the trailer.

4:
Detective Lee testified that the police found a bag next to Sandra’s body, which contained, among other things, bloody paper towels, an empty bottle of Lysol cleaner, a sponge and washcloth that appeared to have blood on them, and a piece of quarter round trim with blood on it.  A piece of quarter round trim was missing from the base of the cabinet area in the kitchen.

5:
On cross-examination, Taylor agreed when asked whether the death could have occurred as early as Saturday morning or “all the way to the possibility of Sunday morning early.”  However, he also stated he did not recall the days of the week, just the actual dates.  On redirect, Taylor testified that Sandra’s death could have occurred anywhere from 8:30 a.m. on the 24th to 8:30 p.m. on the 24th.

6:
Taylor arrived at Sandra’s trailer at about 9:15 a.m. on Sunday, July 25.

7:
See discussion in section IV.B. 
infra
.

8:
Appellant’s description of the events is not in chronological order; it is sometimes difficult to follow the order of events as he describes them.

9:
Again, appellant’s references are somewhat unclear.  It appears from the recording that appellant told Cody that Sandra did not want him to go grocery shopping, but appellant had already said that they had been shopping that day.

10:
However, the evidence cannot be so weak, contested, or incredible that it could not support such a finding by a rational jury.  
McKinney
, 179 S.W.3d at 569; 
Trevino
, 100 S.W.3d at 238
.